Slip Op. 11–8

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| XEROX CORPORATION,<br><br>            Plaintiff,<br><br>       v.<br><br>UNITED STATES,<br><br>            Defendant. | **Before: Gregory W. Carman, Judge**<br><br>Court No.  07-00337 |

[*Defendant's motion to dismiss is denied.  Customs' final determination is remanded for further action consistent with this Opinion and Order.*]

Dated: January 24, 2011

Neville Peterson LLP (John M. Petersvon, Michael T. Cone), for Plaintiff.

Tony West, Assistant Attorney General, Barbara S. Williams, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Saul Davis, Aimee Lee); Chi S. Choy, of counsel, Office of the Assistant Chief Counsel, International Trade Litigation, U.S. Customs and Border Protection, U.S. Department of Homeland Security, for Defendant.

## OPINION & ORDER

CARMAN, JUDGE: Plaintiff Xerox Corporation ("Plaintiff" or "Xerox") has brought this action pursuant to 28 U.S.C. § 1581(e) to challenge a final determination issued by Customs and Border Protection ("Customs" or "CBP") relating to the country of origin of certain laser printer toner cartridges for purposes of government procurement.  This is the first case brought in the U.S. Court of International Trade pursuant to 28 U.S.C. § 1581(e).  Defendant United States ("Defendant," "United States" or the "government")

has moved to dismiss under USCIT Rule 12(b)(1), alleging that the particular determination Customs actually made in this instance is not the type of determination this court has jurisdiction to review, and that this case does not present a justiciable controversy. For the reasons set forth below, Defendant's motion is denied.

BACKGROUND

I.      Statutory Context of Jurisdictional Questions

When Congress passed the Trade Agreements Act of 1979 ("TAA"), it conferred upon the Customs Court, and subsequently upon the U.S. Court of International Trade,[1] "exclusive jurisdiction of any civil action commenced to review any final determination of the Secretary of the Treasury under section 305(b)(1) of the Trade Agreements Act of 1979." 28 U.S.C. § 1581(e). Section 305(b)(1) of the TAA, codified at 19 U.S.C. § 2515(b)(1), states that the Secretary of the Treasury (or Customs, the Secretary's designee[2]) "shall provide for the prompt issuance of advisory rulings and final determinations on whether . . . an article is or would be a product of a foreign country

---

[1]Section 1001(b)(4)(B) of the TAA amended former 28 U.S.C. § 1582 (1976) on July 26, 1979, conferring jurisdiction on the Customs Court to exercise judicial review over these final determinations. Pursuant to the Customs Courts Act of 1980, jurisdiction was reassigned to the Court of International Trade, effective November 1, 1980, and codified at 28 U.S.C. § 1581(e).

[2]For more on the transfer of functions from the Secretary of the Treasury to the Secretary of Homeland Security, see the note "Transfer of Functions" following 28 U.S.C. § 2631.

or instrumentality designated" by a separate statute as eligible for certain benefits described below.  19 U.S.C. § 2515(b)(1).  The TAA establishes a rule of origin for CBP to apply in making these determinations, set out in 19 U.S.C. § 2518(4)(B), and also sets out criteria for how a foreign country or instrumentality becomes "designated," 19 U.S.C. § 2511(b).  To understand the purpose of a final determination made under § 2515(b)(1) (a "Section 305(b)(1) final determination"), and the role of this Court in reviewing these final determinations pursuant to § 1581(e), one must first have a broad view of the statutes and regulations pertaining to country of origin in government procurement.

When purchasing goods for its own use, the federal government has long had a preference for domestically manufactured products.  This preference was established in 1933 by the Buy American Act (41 U.S.C. §§ 10a-10d) ("BAA"), which remains in effect today, and has recently been described as "the immovable object" of U.S. government procurement law.[3]  The BAA does not *mandate* that the government make purchases of domestic goods, but rather establishes a domestic *preference*.  This preference is implemented by regulations which require that, when both foreign and domestic offers have been received for a particular procurement contract, the contracting officer must

---

[3]John A. Howell, *The Trade Agreements Act of 1979 versus The Buy American Act: The Irresistible Force Meets The Immovable Object*, 35 Pub. Cont. L. J. 495 (Spring 2006).

add a margin to the foreign offer, typically of 6, 12 or 50 percent, before comparing the bids and awarding the contract. 48 C.F.R. §§ 25.105(b), 225.105(b).

While the Buy American Act remains a significant part of the government procurement landscape, its effect was dramatically altered by the Trade Agreements Act of 1979, which permits the domestic preference of the BAA to be waived under certain conditions. Title III of the TAA implements the Agreement on Government Procurement ("GPA"), which is a plurilateral agreement developed during the Tokyo Round for the purpose of creating and protecting international reciprocity in government procurement. S. REP. NO. 96-249, at 128 (1979), reprinted in 1979 U.S.C.C.A.N. 381, 514. When a party to the GPA is procuring products above a certain price threshold, that party agrees to treat products from other GPA parties no less favorably than it treats domestic products. Through the TAA, the United States has also extended this benefit of no-less-favorable treatment to countries that extend reciprocal government procurement opportunities to the U.S. (even if such countries are not parties to the GPA), and to least developed countries (without demand for reciprocity). Collectively, parties to the GPA, countries extending GPA-equivalent opportunities to the U.S. and least developed countries are referred to as designated foreign countries and instrumentalities ("DFCIs"). See 19 U.S.C. § 2511(b)(1)–(4). Additionally, as an incentive to encourage adoption of the GPA by other foreign countries, the TAA allows

the U.S. to prohibit procurement of otherwise eligible products from foreign countries that are not a DFCI.  19 U.S.C. § 2512.  The net effect of the TAA is that for procurement offers above the price threshold, the domestic preference imposed by the BAA is *waived* for all articles that are "products of" a designated foreign country or instrumentality. See 19 U.S.C. § 2511(a).

## II.     The Section 305(b)(1) Final Determination

The final determination of whether an article "is . . . a product of" a DFCI is the determination that this Court has jurisdiction to review.  28 U.S.C. § 1581(e); see also 19 U.S.C. § 2515(b)(1).  Customs has promulgated regulations to establish the procedures through which it would issue Section 305(b)(1) advisory rulings and final determinations.  See 19 C.F.R. Part 177, Subpart B.  These regulations implement various aspects of the TAA, including the applicable rule of origin (compare 19 U.S.C. § 2518(4)(B), with 19 C.F.R. § 177.22(a)), and the definition of who qualifies as a party-at-interest with the right to request a country-of-origin determination or to seek its judicial review (compare 28 U.S.C. § 2631(e), (k)(2),[4] with 19 C.F.R. §§ 177.22(d), 177.23, 177.30).

---

[4]The party-at-interest language was originally included in Section 1001 of the TAA, which assigned jurisdiction to judicially review these determinations to the Customs Court.  The Customs Courts Act of 1980 removed the party-at-interest language from the jurisdictional statute (newly created 28 U.S.C. § 1581), and placed it in 28 U.S.C. § 2631.

Over the three decades that the TAA has been in effect, Customs has rendered final determinations pursuant to Section 305(b)(1) that, while consistent with the statute, are arguably more specific than minimally statutorily required. The statute provides for the issuance of final determinations as to whether "an article is or would be a product of a foreign country or instrumentality designated pursuant to 19 U.S.C. § 2511(b)"—a question that could be answered accurately, if somewhat narrowly, with a "yes" or a "no." See 19 U.S.C. § 2515(b)(1). The phrase "country of origin determination" does not appear in Section 305(b) of the TAA, and nothing in the statute compels Customs to make formal pronouncement about what the country of origin is for a given article—only whether it is a product of a DFCI. And yet, Customs has chosen to implement this statute via regulations requiring itself to produce full blown "country-of-origin determinations" in virtually every case where a Section 305(b)(1) final determination has been requested. See 19 C.F.R. § 177.21 (explaining that "[t]his subpart applies to the issuance of **country-of-origin** . . . **final determinations**"), and § 177.23 (explaining who may request a "**country-of-origin** . . . **final determination**") (emphases added).

Customs' regulatory construal of Section 305(b)(1) is not inconsistent with the statute, because when the country of origin of an article has been identified, it is self-evident whether that country is a DFCI. When issuing final determinations pursuant to

this subpart, Customs routinely frames the issue presented as "what is the **country-of-origin** of [Product X] for the purpose of U.S. government procurement?" Customs then typically issues its ruling in the form: "the **country of origin** of [Product X] for the purpose of U.S. government procurement is [Country Y]." Because Country Y either is or is not a DFCI, Customs' ruling therefore satisfies the requirement of Section 305(b)(1). Moreover, the notion that Section 305(b)(1) should be implemented with a country-of-origin determination has its roots in the legislative history of the TAA, and has been consistently applied by Customs for over thirty years. The first reference to the Section 305(b)(1) final determination as identifying "the **country of origin** of specified products" is found in the Senate Report to the TAA. 1979 U.S.C.C.A.N. at 523 (emphasis added). And from the first proposed draft (published April 9, 1981) to the current heading of 19 C.F.R. Part 177, Subpart B, Customs has consistently referred to the Section 305(b)(1) final determination as a "**country-of-origin determination**." See 46 Fed. Reg. 21,194-01; see also 19 C.F.R. Part 177, Subpart B (2010).

It bears noting—for reasons that will become clear upon hearing Defendant's contentions in this case—that the statute does not mandate any specific outcome of a Section 305(b)(1) final determination, and is indifferent to which particular outcome the party requesting the ruling is hoping to obtain. As long as Customs' ruling makes clear whether or not the article in question "is or would be a product of" a designated foreign

country or instrumentality, it has conformed with the statutory requirement. See 19 U.S.C. § 2515(b). In fact, the statutory scheme seems designed to produce rulings sought by parties whose economic incentive is to obtain a "negative" ruling. The remarkably broad party-at-interest standards crafted by Congress not only permit rulings to be issued to parties that wish to qualify their own product as TAA waiver-eligible, but also to parties hoping for a ruling that a competitor's product is *not* from a DFCI, and therefore *not* waiver-eligible. See 28 U.S.C. 2631(e), (k)(2); 19 C.F.R. §§ 177.22(d), 177.23.

In other words, the Section 305(b)(1) final determination is highly mechanical. Any party-at-interest can request a final determination about any article for which they qualify as a party-at-interest. So long as that party complies with the regulatory requirements for requesting a ruling, and provides enough information for Customs to reach a conclusion, a final determination will issue. See 19 C.F.R. § 177.23-.28 (specifying, *inter alia*, who may request a Section 305(b)(1) determination; the form and contents of that request; how, where and by whom it is to be filed; how to request oral discussion of the issues; and that Customs, upon receipt of a properly made request, "will promptly issue a final determination."). By issuing the final determination in the format Customs prefers ("the country of origin of [Product X] . . . is [Country Y]"), all parties-at-interest are left with an outcome that both answers the central question posed

by the statute, and complies with the regulatory requirement to issue a country-of-origin determination, thereby providing valuable additional specificity. Once issued, the determination comes with no strings attached; these parties-at-interest are free to use a Section 305(b)(1) final determination for whatever purpose they see fit.

## III. Rules of Origin Under the TAA and BAA

While Customs' regulations spell out the conditions under which determinations can be obtained, the substance of the Section 305(b)(1) final determination is found in the application of a rule of origin, set out in the TAA, to the facts of a particular product's manufacture. See 19 U.S.C. §§ 2515(b)(1), 2518(4)(B). Under the TAA rule of origin,

> An article is a product of a country or instrumentality only if (i) it is wholly the growth, product, or manufacture of that country or instrumentality, or (ii) in the case of an article which consists in whole or in part of materials from another country or instrumentality, **it has been substantially transformed into a new and different article of commerce with a name, character, or use distinct from that of the article or articles from which it was so transformed**.

19 U.S.C. § 2518(4)(B) (emphasis added). Disputes under part (i) of this rule of origin would be rare. Consequently, in the context of a Section 305(b)(1) final determination, conflicts regarding the country of origin typically hinge on where a particular article is found to have been substantially transformed.[5] While this is the first 28 U.S.C. § 1581(e)

---

[5]For ease of reference, the court will refer to this rule of origin from the TAA simply as a "substantial transformation" rule of origin.

case brought at the U.S.C.I.T., the court has frequently dealt with similar substantial transformation issues in the context of reviewing other types of country of origin determinations. See, e.g., Ugine and ALZ Belgium, N.V. v. U.S., 31 CIT 1536, 1541-43, 517 F. Supp. 2d 1333, 1337-38 (2007) (noting the substantial transformation determinations made by both Customs and the U.S. Department of Commerce in the context of a countervailing duty proceeding), Torrington Co. v. U.S., 8 CIT 150, 596 F. Supp. 1083 (1984) (making a substantial transformation determination in the context 28 U.S.C. § 1581(a)).

The substantial transformation rule of origin stands in contrast to the rule of origin that applies under the Buy American Act. In order for a good to be considered a "domestic end product," procurable under the BAA, it must be manufactured in the United States "substantially all from articles, materials, or supplies mined, produced, or manufactured . . . in the United States." 41 U.S.C. § 10a(a). By executive order, "substantially all" has been clarified to mean greater than 50% domestic content. Exec. Order No. 10,582, 19 Fed. Reg. 8,723 (Dec. 17, 1954), reprinted as amended after 41 U.S.C. § 10d at 346-47 (2006).

The disparity between the applicable rules of origin under the TAA and the BAA is not without consequence. As originally implemented, this incongruity threatened to effect a *dis*advantage for certain goods manufactured in the U.S., that was nothing short

of ironic. While the purpose of the TAA had been to extend no-less-favorable treatment to products from preferred trading partners than was given to domestic products, it soon became clear that certain foreign goods might be treated *more* favorably than goods comparably produced in the United States. Specifically, there was uncertainty as to the procurement eligibility of goods substantially transformed in the United States from mostly foreign components.

These so-called "U.S.-made end products" cannot receive the BAA's domestic procurement preference, because they are distinct from domestic end products, which meet the 50% domestic content requirement of the BAA. However, they were not automatically guaranteed to fare better under the TAA. Because U.S.-made end products are not substantially transformed in a designated *foreign* country or instrumentality, they were thought not to be eligible for a TAA waiver of BAA requirements. See generally 19 U.S.C. § 2511. But at the same time, while U.S.-made end products did not appear to qualify for preferential treatment under the BAA or the TAA, the TAA does not permit their procurement to be prohibited. The prohibition provision of the TAA only applies to goods substantially transformed in *foreign* countries that are not a DFCI. See 19 U.S.C. § 2512. The consequence of the bare overlay of the rules of origin in the BAA and the TAA was the peculiar, and politically unpalatable prospect that a good substantially transformed in a DFCI—say,

Canada—from entirely foreign components, could be preferred in U.S. government procurement over an identical product substantially transformed in the U.S. from the *same* foreign components. Fortunately, as will be explained below, administrative action has spared U.S.-made end products from such an ignominious fate.

## IV. The Section 305(b)(1) Final Determination at Issue in This Case

Xerox challenges a final determination issued in ruling letter HQ H009107 on August 2, 2007 to Nukote International—a company that is not a party to this action. (See Compl., Ex. A.) Nukote had sought a Section 305(b)(1) final determination regarding the country-of-origin of its refurbished laser printer toner cartridges. (Id.) Customs was presented with three different manufacturing scenarios, and was asked to determine the country-of-origin for the printer cartridges in each. Customs framed the issue as "[w]hat is the country of origin of the subject laser printer cartridge models for the purpose of U.S. Government procurement?" (Id.) Customs' holding in HQ H009107 was that the merchandise in question was not substantially transformed in the United States. (Id. at 3.) Customs did not articulate *where* the goods were substantially transformed, and therefore did not positively identify the country of origin. (See id.) Moreover, Customs' ruling did not otherwise establish whether or not the articles in question were products of a designated foreign country or instrumentality. (See generally, id.)

Xerox has brought this case seeking a determination from the Court that Customs erred, because the processing of Nukote's goods in the United States was sufficient to effect substantial transformation, and that the country of origin for purposes of government procurement is therefore the United States. (Compl. ¶¶ 21-42.) While the Court was not provided with a copy of Nukote's original request that precipitated this ruling letter, based on the way Customs framed its holding, it appears that Nukote presented the question to Customs in essentially the same way–seeking a determination of whether or not its goods had been substantially transformed in the United States.

PARTIES' CONTENTIONS

## I.     Defendant's Contentions

Defendant advances two central arguments in its motion to dismiss: (1) that the determination issued by Customs is not a final determination described in Section 305(b)(1), and the Court therefore lacks jurisdiction to review it, and (2) that even a favorable ruling from the Court is incapable of providing meaningful relief to Xerox, and as such this case raises no justiciable controversy. (Mem. In Supp. Of Def.'s Mot. To Dismiss This Action ("Def.'s Mot.") 1-3, 9-21.)

In making its first argument, Defendant points out that 28 U.S.C. § 1581(e) jurisdiction is only available to review a final determination issued pursuant to Section

305(b)(1) of the TAA. Quoting the language of Section 305(b)(1), Defendant argues that in the present case "Customs **never** made a determination on whether the products in question were, or were not,[6] a product of a designated foreign country or instrumentality," and that therefore, "conspicuously absent is a decision by Customs that is reviewable by the Court pursuant to section 1581(e)." (Id. at 13 (internal quotation omitted) (emphasis in original).) Instead, Defendant argues that Customs decided whether or not Nukote's toner cartridges were products of the United States, a final determination it believes falls outside the scope of Section 305(b)(1). (Id. at 12-13.) Defendant offers no theory as to why its client—Customs—issued a ruling that it now claims was without statutory authorization.

The government evinces its belief that the only reason Nukote and Xerox could have possibly wanted a determination that the goods in question were substantially transformed in the United States would be to qualify these goods for procurement

---

[6]In its reply, Defendant actually takes this argument a step further, claiming that under Section 305(b)(1) and 19 C.F.R. § 177.21, Customs is "only permit[ted] to make rulings *related to products of foreign designated countries and instrumentalities*." (Def.'s Reply to Pl.'s Opp'n. to Def.'s Mot. to Dismiss this Action ("Def.'s Reply.") 12 (emphasis added).)

If Customs' decision making ability during a Section 305(b)(1) final determination was constrained as suggested by Defendant, Customs would be prohibited from issuing a determination about any product which it might conclude was not a product of a designated foreign country or instrumentality. Clearly, as negative determinations are fully contemplated by the statute, Defendant's view is unduly restrictive.

under the Buy American Act. Defendant points out that this would not work. Citing the "different criteria for the determination of country of origin" under the BAA and TAA, Defendant points out—correctly—that "the criteria for one cannot be substituted for the other." (Id. at 13.) A ruling that Nukote's goods were substantially transformed in the U.S. would not address whether they met the 50% domestic content requirement of the BAA. Defendant can imagine no other purpose for which Nukote or Xerox could have wanted the requested ruling.

Defendant's second argument—that this case lacks a justiciable controversy—is built on its belief that the ruling sought by Nukote and Xerox would be useless. Because the government believes that "the only relief that would be meaningful to Xerox" would be a determination that its goods qualify for U.S. government procurement under the BAA, and because HQ H009107 only addresses itself to the issue of substantial transformation, Defendant claims that a determination by the Court that Plaintiff's goods were substantially transformed in the U.S. would be worthless. In addition to assailing the "meaningful[ness]" of any relief the Court could provide, Defendant also characterizes such relief as not "effectual," not "consequential", not "concrete", not "specific", not "conclusive", and with "no practical application." (Def.'s Mot. 17-20.)

## II. Plaintiff's Contentions

Xerox responds to the motion to dismiss primarily by asserting that Defendant's arguments evince a misunderstanding of the status of the U.S.-made end product in government procurement. (Mem. in Opp'n. to Def.'s Mot. to Dismiss ("Pl.'s Resp.") 12-19.) According to Xerox, Nukote's ruling request (and Xerox's case) are not misguided attempts to qualify the goods in question for government procurement under the BAA, nor did they need to be, because "at all times relevant to this litigation," federal regulations establish that U.S.-made end products were eligible for government procurement in their own right. (Id. at 16 (citing 48 C.F.R. §§ 25.003, 25.403.)

Plaintiff devotes virtually all of the argument in its response brief to demonstrating that Defendant's understanding of government procurement law is considerably out of date. (Id. at 12-19.) Plaintiff cites a 1990 decision by the General Services Administration Board of Contract Appeals ("GSBCA") in which this "federal tribunal" addressed the conundrum created by the overlapping rules of origin between the BAA and TAA, described above. (Id. at 12-16); see also supra at 9-12. In Protest of International Business Machines Corporation, 90-2 B.C.A. (CCH) P22,824, 1990 GSBCA LEXIS 213 (May 18, 1990), IBM had offered certain computers for sale to the U.S. government that had been substantially transformed in the United States but that did not contain more than 50% domestic content. Id. at *10-11. By operation of a federal acquisition regulation in effect at the time, IBM's offer was rejected: the computers did

not qualify as designated country end products under the TAA, and did not qualify as domestic end products under the BAA. Id. The GSBCA reviewed the regulation that had led to the exclusion of IBM's U.S.-made end products in the government procurement bidding process, and held that it was inconsistent with 19 U.S.C. § 2512, which only permits the exclusion of products from foreign countries that have not been designated. Id. at *17-21. The GSBCA found that goods like IBM's could not be excluded from government procurement by virtue of the TAA. Id. As a result, the General Services Administration, which was bound by the GSBCA determination, created a special category of procurable goods it denoted "U.S.-made end products." General Services Administration Acquisition Regulation, 55 Fed. Reg. 46,068-01 (temporary rule Nov. 1, 1990); 57 Fed. Reg. 42,708-01 (final rule Sep. 16, 1992). Over the following decade or so, the U.S.-made end product came to be viewed as a sensible component of government procurement law, and exceptions were created for it by the heads of individual agencies, and eventually in the general federal acquisition regulations and defense federal acquisition regulations. (Pl.'s Resp. at 16-19); see also Defense Federal Acquisition Regulation Supplement, 62 Fed. Reg. 47,407-01 (proposed rule Sep. 9, 1997) (waiving the restrictions of the BAA for Defense Department acquisition of certain information technology products), Federal Acquisition Regulation; Foreign Acquisition (Part 25 Rewrite), 64 Fed.Reg. 72,416-01, 72,422 (final rule Dec. 27,

1999) (creating a category for U.S.-made end products in the general Federal Acquisition Regulations). As a result of these and other changes to the government procurement landscape, it has been the case for many years, and at all times relevant to this litigation, that products substantially transformed in the U.S. are highly eligible for government procurement.

While Plaintiff therefore responds to Defendant's second argument in great detail, it devotes considerably less attention to Plaintiff's first argument – that the determination issued by Customs in this case is not a Section 305(b)(1) determination. On that point, Plaintiff simply points out that HQ H009107 was "rendered pursuant to Section 305(b)(1) of the Trade Agreements Act of 1979." (Pl.'s Resp. at 8.) Plaintiff does not address the apparent disparity identified by Defendant: how a final determination as to whether the goods in question were substantially transformed in the United States satisfies the requirement of Section 305(b)(1) that Customs decide whether the articles are products of "a foreign country or instrumentality designated" pursuant to the TAA. 19 U.S.C. § 2515(b).

## ANALYSIS

### I.     This Case Presents a Justiciable Controversy

Defendant's argument that this case lacks a justiciable controversy, because even a favorable ruling on Xerox's claims could not provide Plaintiff with meaningful relief,

is without merit. The relief sought by Xerox in its Complaint is an order that would "set aside the final determination of Customs as unlawful," and "such further and additional relief as this Court may deem proper." (Compl. at 14.) Defendant does not argue that this relief is fundamentally unavailable, but rather claims that Plaintiff will not be able to turn such a judgment into something with real utility or economic value. That concern does not raise a problem of justiciability. Moreover, given the status of the U.S.-made end product in government procurement, it appears that, should Xerox prevail in this case, it would have no trouble extracting utility out of a favorable judgment.

This case is justiciable because it presents an appropriate occasion for judicial action. See 13 Wright & Miller § 3529. Namely, it presents "a real and substantial controversy" between Xerox and the government, which the Court may resolve by providing "specific relief through a decree of conclusive character." See Aetna Life Ins. Co. of Hartford, Conn. v. Haworth, 300 U.S. 227, 241 (1937). Contrary to Defendant's assertions, this case will not require the court to stray "into a prediction of future events," nor does it involve "uncertain or contingent future events" at all. (See Def.'s Mot. at 16 (citations omitted).) Namely, it is *possible* the Court could determine that the goods described in the ruling letter were substantially transformed in the United States, or in some other country, and reverse the determination made by Customs. Plaintiff

faces no more of a challenge in rendering economic value from such a favorable judgment than a plaintiff in any civil case. It is always incumbent on a plaintiff to know why it seeks a particular ruling, and the fact that the Defendant is puzzled by Plaintiff's motivation does not raise a problem of justiciability. As noted above, the right to obtain a Section 305(b)(1) final determination (or to obtain judicial review of it) is unaffected by the motivation of the party requesting the determination, and the consequences that flow from it. See supra at 7-8.

Moreover, Defendant's qualms about a potential judgment lacking meaning stem from a radical misapprehension of the state of government procurement law. As Xerox has compellingly demonstrated, the U.S.-made end product has been highly procurable for quite some time. Accordingly, a ruling that a particular article has been substantially transformed in the U.S. has great potential value. Nukote and Xerox are by no means the only parties to have seen economic value in this type of ruling. The Court's review of relevant legal databases reveals that no less than half of the Section 305(b)(1) final determinations issued by Customs over the last 30 plus years have dealt squarely with the issue of whether a given article was substantially transformed in the United States. Therefore, hearing no persuasive argument to the contrary, the Court finds that this case presents a justiciable controversy.

## II.      HQ H009107 Contains a Section 305(b)(1) Final Determination

The government's remaining argument—that the Court lacks jurisdiction because the final determination issued by Customs in HQ H009107 is not a Section 305(b)(1) determination—is also unavailing.  The ruling letter states that it is issued "[p]ursuant to Subpart B of Part 177, 19 CFR [§] 177.21 *et seq.*, which implements Title III of the Trade Agreements Act of 1979, as amended (19 U.S.C. § 2511 *et seq.*)[.]"  It could scarcely be clearer.  When Customs issued this ruling, it did so pursuant to its authority conferred by Title III of the TAA.  The document Customs produced indicates that the agency issued what it believed to be a Section 305(b)(1) final determination.  Moreover, under 28 U.S.C. § 1581(e), this court has exclusive jurisdiction to review "**any** final determination . . . under section 305(b)(1)."  28 U.S.C. § 1581(e) (emphasis added).  Even if the decision actually rendered contains shortcomings, HQ H009107 is clearly *a* final determination under Section 305(b)(1) and as such, the court has jurisdiction to review it.

It must be noted that Customs flirted briefly with the theory here advanced by its attorneys, but ultimately chose the analysis advocated by Plaintiff.  In the first Section 305(b)(1) final determination issued after the GSBCA's decision in IBM, HQ 734977, Customs explained that, on advice of the U.S. Trade Representative, it believed it was "not authorized to render final determinations concerning whether an article is a

product of the U.S. for purposes of Title III of the Trade Agreements Act," because Section 305(b)(1) final determinations may only be made about products of designated foreign countries, a category that necessarily excludes the United States. Final Determination - U.S. Government Procurement, 1993 U.S. Custom HQ Lexis 2084 at *3–*4. (April 2, 1993); see also Gary H. Sampliner & Brian J. O'Shea, *Rules of Origin for Foreign Acquisitons Under the Trade Agreements Act of 1979, NAFTA, and the New GATT Accords*, 23 Pub. Cont. L.J. 207, 220-21 (1994). However, Customs quickly abandoned this position without apparent explanation. In the very next Section 305(b)(1) final determination issued by the agency (HQ 735346), Customs proceeded *without objection* to determine that the country of origin of some articles in question was the United States. U.S. Government Procurement; Final Determination; 1995 U.S. Custom HQ Lexis 243 at *9, *18–*19 (Feb. 23, 1995).[7] No rationale was provided for this change in the ruling letter, and the Court has located no final determination in which Customs has revisited the issue since. Over the following fifteen years, Customs has repeatedly issued determinations that various products were or were not substantially transformed in the United States, without once claiming that it lacked statutory authority to do so.

---

[7]The Court notes that both of these ruling letters were issued by the same Customs official, Harvey B. Fox, then the Director of the Office of Regulations and Rulings.

Defendant, though, has raised an interesting point. What if its client, Customs, has been issuing final determinations pursuant to Section 305(b)(1) that are beyond the scope of that statute? As noted above, the nature of the ruling issued to Nukote was not unusual; more than half of the purported Section 305(b)(1) final determinations ever issued by Customs have addressed whether the articles in question were products of the United States. If the theory advanced by Defendant is correct, Customs has flagrantly spurned the requirements of the statute and engaged in an unchecked pattern of *ultra vires* activity. Fortunately, Defendant is wrong.

When issuing a Section 305(b)(1) final determination, as long as Customs actually determines the country of origin (or rules that the country of origin is indeterminate under the facts of the case), it complies with the requirements of 19 U.S.C. § 2515(b)(1) and 19 C.F.R. § 177 Subpart B. As explained above, from the moment Customs makes its pronouncement regarding country of origin, whether the "article is or would be a product of a foreign country or instrumentality designated pursuant to" the TAA becomes self-evident. See id. This conclusion follows whether Customs rules that the article has been substantially transformed in Canada, North Korea, the United States, or any other country or instrumentality. Additionally, a final determination that although sufficient facts have been presented, it cannot be determined where the product was substantially transformed, is also consistent with the statute. Nothing in the statute

would require Customs to make a speculative final determination upon insufficient facts. Such a ruling would have the same practical effect as a negative Section 305(b)(1) final determination—a finding that the articles in question do not qualify as products of any DFCI.

### III. HQ H009107 is Incomplete, and Warrants a Remand

While nothing about the inquiry *undertaken* in HQ H009107 was fundamentally inconsistent with Section 305(b)(1), Customs left the job unfinished. As the final determination now stands, it fails to indicate whether Nukote's goods are or are not products of a DFCI. As such, the Court finds that a remand is appropriate. Customs adequately framed the issue in HQ H009107 as "[w]hat is the country of origin of the subject laser printer cartridge models for the purpose of U.S. Government procurement?" (Compl. Ex. A.) But, Customs held that "[t]he operations performed at Nukote's Rochester, New York facility do not result in a substantial transformation of the cartridges. Therefore, the cartridges will not be considered to be products of the United States." (Pl.'s Resp. at 6.) The problem with this holding is that Customs fails to establish *where* the goods have been substantially transformed, or even *if* they have been substantially transformed.

It is possible, given the facts in this case, that substantial transformation occurred in one of any number of countries, or that the country of origin is indeterminate. In the

final determination, Customs explains that Nukote's printer cartridges are recycled from empty toner cartridges that have been collected "in the United States and, to a substantially lesser extent, in Canada, Singapore, the United Kingdom, Hong Kong and China." (Id. at 2.) The empty cartridges are sorted in an unnamed "foreign location," and certain manufacturing processes take place in an unnamed "second foreign location," before final processes are undertaken in the United States. (Id. at 5.) It is appropriate for Customs to first address whether any of these processes substantially transformed Nukote's goods before the Court reaches the merits of this case.

In the context of reviewing administrative action, the Supreme Court has stated that a court cannot "be expected to chisel that which must be precise from what the agency has left vague and indecisive." SEC v. Chenery Corp., 332 U.S. 194, 197 (1947). When an agency violates a statutory obligation to provide a clear decision, the court must remand the decision to the agency for clarification, so that the court does not "propel [itself] into the domain which Congress has set aside exclusively for the administrative agency." Id. at 196. Moreover, this Court has explicit statutory authority to "order any . . . form of relief that is appropriate in a civil action, including . . . orders of remand." 28 U.S.C. § 2643(c)(1).[8] Customs must remedy the shortcomings in HQ H009107 by taking action consistent with Section 305(b)(1) of the TAA, consistent

---

[8]Additionally, the Court notes that Plaintiff has requested a remand in its prayer for relief. (Compl. 14.)

with its regulations set out in 19 C.F.R. Part 177, Subpart B which require the issuance of a country of origin determination, and consistent with its 30 year practice of issuing complete country of origin determinations. On remand, Customs must identify the country of origin of Nukote's printer cartridges for purposes of government procurement, or, alternatively, make an explicit final determination that the country of origin cannot be determined. For the foregoing reasons, Defendant's motion to dismiss is therefore denied, and this case is remanded to Customs.

**ORDER**

Upon consideration of Defendant's motion to dismiss, Plaintiff's response thereto, and Defendant's reply, and upon due deliberation, it is hereby

**ORDERED** that Defendant's motion to dismiss is hereby DENIED, and it is further

**ORDERED** that no later than **Tuesday, February 8, 2011**, Customs shall file with the Court a final determination upon remand that is consistent with this Opinion and Order, and it is further

**ORDERED** that on remand, Customs must identify the country of origin of Nukote's printer cartridges for purposes of government procurement, or, alternatively, make an explicit final determination that the country of origin cannot be determined, and it is further

 **ORDERED** that the parties shall submit to the Court no later than **Tuesday,**

**February 15, 2011** a joint proposed scheduling order governing the balance of this case.


                                        ___/s/ Gregory W. Carman___
                                         Gregory W. Carman, Judge


Dated:        January 24, 2011
              New York, NY

**ERRATA**

Please make the following changes to <u>Xerox Corp. v. United States</u>, Court No. 07-00337, Slip Op. No. 11-8:

(1) page 1, counsel list, strike the following

- "John M. Petersvon"

and replace with

- "John M. Peterson"

(2) page 22, line 6, strike the following

- *"Foreign Acquisitons"*

and replace with

- *"Foreign Acquisitions"*

January 31, 2011